NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| J.K., | |
| Petitioner, | Court of Appeals No. A-13372 |
| | Trial Court No. 1JU-18-00238 CR |
| v. | |
| | **O P I N I O N** |
| STATE OF ALASKA, | |
| Respondent. | No. 2670 — July 17, 2020 |

Petition for Review from the District Court, First Judicial District, Juneau, Kirsten Swanson, Judge.

Appearances: Renee McFarland, Assistant Public Defender, and Beth Goldstein, Acting Public Defender, Anchorage, for the Petitioner. Nancy R. Simel, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for the Respondent.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge ALLARD.

A criminal defendant is incompetent to stand trial when, as a result of a mental disease or defect, the defendant is "unable to understand the proceedings against

the defendant or to assist in the defendant's own defense."[1]  It is a violation of due process to try a defendant who is incompetent to stand trial.[2]  When a defendant has been found to be incompetent, the trial court is required to stay the criminal proceedings.[3]  Under AS 12.47.110(a), a trial court has the authority to commit an incompetent defendant "to the custody of the commissioner of health and social services" for up to 90 days in an effort to restore the defendant to competency.  This initial commitment period is mandatory in all felony cases but discretionary in misdemeanor cases.[4]

The only facility that currently provides competency restoration treatment in the State of Alaska is the Alaska Psychiatric Institute (API), which is administered by the Department of Health and Social Services.  For some time, API has had significant capacity issues, with only ten beds available in their forensic unit.  As a result, waitlists have developed, and incompetent defendants who have been committed for competency restoration are instead remaining in jail for long periods of time awaiting transfer to API.

---

[1]  AS 12.47.100(a); *see also Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam) (holding that the constitutional standard for competency to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him").

[2]  *See, e.g.*, *Medina v. California*, 505 U.S. 437, 439 (1992); *Diggs v. State*, 274 P.3d 504, 505 (Alaska App. 2012).

[3]  AS 12.47.110(a) ("When the trial court determines by a preponderance of the evidence, in accordance with AS 12.47.100, that a defendant is so incompetent that the defendant is unable to understand the proceedings against the defendant or to assist in the defendant's own defense, the court shall order the proceedings stayed . . . .").

[4]  AS 12.47.110(a).

These delays in obtaining competency restoration treatment raise serious due process concerns.[5]

The current case involves an incompetent defendant, J.K.,[6] who was charged with a misdemeanor and committed to the custody of the Department of Health and Social Services for competency restoration treatment under a 90-day commitment order. J.K. was placed on a waitlist and remained in jail pending admission to API. When it became clear that the 90-day order was likely to expire before J.K. could be transferred to API, J.K.'s defense attorney moved to dismiss the case in the furtherance of justice. The district court denied this motion. Later, after the 90-day order expired — with J.K. still in jail and still on API's waitlist — J.K.'s defense attorney moved a second time to dismiss the case. This time, the attorney argued that J.K.'s right to substantive due process under *Jackson v. Indiana*[7] was being violated by the delay in receiving treatment and that the proper remedy for this constitutional violation was dismissal without prejudice. At the urging of the prosecutor, however, the trial court entered a second 90-day commitment order and ultimately denied the motion to dismiss.

In response, J.K.'s attorney filed a petition to this Court, seeking immediate review of the trial court's ruling. Instead of filing a response to the petition, the State responded by dismissing J.K.'s case without prejudice under Alaska Criminal Rule 43(a)(1). Although J.K.'s case was now moot, we granted the petition under the public interest exception to the mootness doctrine.[8] We now hold that the prolonged delay in

---

[5] *See Jackson v. Indiana*, 406 U.S. 715 (1972).

[6] We use initials to protect J.K.'s privacy.

[7] *Jackson v. Indiana*, 406 U.S. 715 (1972).

[8] *See State v. Roberts*, 999 P.2d 151, 153 (Alaska App. 2000) ("The public interest exception requires the consideration of three main factors: (1) whether the disputed issues

(continued...)

obtaining competency restoration treatment violated J.K.'s right to substantive due process and required dismissal without prejudice of J.K.'s criminal case.

*Factual background*

In March 2018, J.K. was arrested and charged with fourth-degree fear assault, a misdemeanor.[9] The charge was based on an incident at a Juneau restaurant in which J.K. allegedly approached another patron and threatened her with a butter knife. At arraignment, it was clear that J.K. had serious mental health issues; the court questioned whether "there might be a Title 47 issue" and stated that "in an abundance of caution," it would require a "Title 47" before J.K.'s release — a consideration that was never addressed again.

(Title 47 governs the civil commitment of persons who are mentally ill and, as a result of that condition, are likely to cause harm to themselves or others, or are

---

[8] (...continued)
are capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented, and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine." (quoting *Krohn v. State Dep't. of Fish & Game*, 938 P.2d 1019, 1021 (Alaska 1997))).

[9] AS 11.41.230(a)(3). J.K. was initially charged with third-degree assault (AS 11.-41.220(a)(1)(A)), which was reduced to fourth-degree assault at arraignment.

gravely disabled.[10] This civil procedure for involuntary commitment is independent from any criminal proceedings that may have been instituted.[11])

J.K. was appointed an assistant public defender. The assistant public defender filed an unopposed motion for a competency evaluation, which was granted by the court. By the time the evaluation was submitted (approximately three weeks after the 60-day deadline set by the court), J.K. had already been in custody for 143 days.

The forensic psychologist who conducted the evaluation, Dr. Dianna Rehn, had difficulties with the evaluation. J.K. is Korean and has limited proficiency in English. Dr. Rehn attempted to interview J.K. twice — the second time with an interpreter — but J.K. was continually shouting at the interpreter. The interpreter also stated that J.K. was speaking an "atypical" form of Korean that was mostly "gibberish."

---

[10] *See* AS 47.30.700-.915 (authorizing involuntary commitment pursuant to specified procedures for those persons who are "mentally ill" and, as a result, are "gravely disabled" or "likely to cause serious harm" to themselves or others); *see also* AS 47.30.915(9)(B) (defining "gravely disabled" as "a condition in which a person as a result of mental illness will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently"); AS 47.30.915(12)(A),(B) (defining "likely to cause serious harm" as posing "a substantial risk of bodily harm to that person's self, as manifested by recent behavior causing, attempting, or threatening that harm" or "a substantial risk of harm to others as manifested by recent behavior causing, attempting, or threatening harm, and is likely in the near future to cause physical injury, physical abuse, or substantial property damage to another person"); AS 47.30.915(14) (defining "mental illness" as "an organic, mental, or emotional impairment that has substantial adverse effects on an individual's ability to exercise conscious control of the individual's actions or ability to perceive reality or to reason or understand").

[11] *In re Hospitalization of Linda M.*, 440 P.3d 168, 173 (Alaska 2019) (noting that incompetency to stand trial and mental illness for purposes of civil commitment coexist and that commitment to treat these two conditions may be sequential, concurrent, or overlap if each is independently justified).

Dr. Rehn reported that J.K. was not doing well in custody and that he had been transferred to the jail's acute mental health unit. J.K. was noncompliant with his psychotropic medications and was exhibiting bizarre behavior, including walking around naked, reacting to internal stimuli, speaking gibberish, and barking. J.K. refused to shower and was "malodorous." He had also developed an eye infection after placing his fingers in his rectum and then in his eye. J.K. refused any treatment for this eye infection.

Dr. Rehn diagnosed J.K. with "an unspecified schizophrenia spectrum or other psychotic disorder," and she concluded that he was incompetent to stand trial — that is, she found that J.K. lacked the capacity to understand the proceedings against him or to assist in his own defense.[12] The doctor opined that treatment with psychiatric medications would "likely improve [J.K.'s] symptoms," but it was "unclear [if] this improvement would restore [J.K.] to competency." Dr. Rehn further opined that it was "highly unlikely" that J.K. could be restored to competency if he continued to be noncompliant with his psychotropic medications. She also noted that restoration services were likely to be made more difficult by J.K.'s limited English.

A status hearing regarding the competency evaluation was held on August 14, 2018. By the time of the hearing, J.K. had already served 149 days in custody.

At the hearing, the trial court found J.K. incompetent to stand trial, and the court ordered J.K. to be committed to API for competency restoration treatment under AS 12.47.110(a). The trial court acknowledged that it was not required to order competency restoration treatment in J.K.'s case because he was only charged with a

---

[12] AS 12.47.100(a) (defining incompetency to proceed as when a defendant, "as a result of mental disease or defect, . . . is unable to understand the proceedings against the defendant or to assist in the defendant's own defense").

misdemeanor.[13] But the court justified its decision to order treatment on the ground that J.K. would likely be a danger to himself and to others if released or, "at the very least, gravely disabled." The court did not address the possibility of a dismissal without prejudice and civil commitment under Title 47.

The trial court committed J.K. to the custody of the Department of Health and Social Services (the department that administers API) for a period not to exceed 90 days. The written order was signed the day after the hearing — on August 15 — and distributed on August 21.

On September 6, API notified the court that its forensic beds were full and that J.K. was number twenty-six on the waitlist. API further informed the court that it was "likely" that the delay in admitting J.K. to API would account for "most, if not all" of the 90-day commitment order. During the delay, J.K. would remain in jail without any competency restoration treatment.

The trial court held a status hearing on September 12 to discuss the delay in obtaining treatment. The defense attorney noted that J.K. was only charged with a misdemeanor, that he had already been in custody for almost six months, and that there was a low likelihood that he was even restorable to competency. The trial court agreed that the forensic report indicated that Dr. Rehn "didn't really have a high level of confidence that things were going to improve," and, in fact, "[J.K.] was getting

---

[13] *See* AS 12.47.110(a) ("When the trial court determines by a preponderance of the evidence, in accordance with AS 12.47.100, that a defendant is so incompetent that the defendant is unable to understand the proceedings against the defendant or to assist in the defendant's own defense, the court shall order the proceedings stayed, . . . and shall commit a defendant charged with a felony, and *may* commit a defendant charged with any other crime, to the custody of the commissioner of health and social services or the commissioner's authorized representative for further evaluation and treatment until the defendant is mentally competent to stand trial, or until the pending charges against the defendant are disposed of according to law, but in no event longer than 90 days." (emphasis added)).

progressively worse." The court called API to help "decide where [to] go for [J.K.] at this point," and it scheduled another hearing on the matter for the following week.

The next day, on September 13, J.K.'s defense attorney filed a motion to dismiss under Alaska Criminal Rule 43(c). Criminal Rule 43(c) grants trial courts limited authority to dismiss criminal cases in "furtherance of justice."[14] The defense attorney argued that dismissal of J.K.'s charge was the appropriate remedy given the delay that had already occurred, the delay that was anticipated to occur, and the amount of time J.K. had already spent in custody. The defense attorney pointed out that the maximum penalty for a class A misdemeanor is one year and that J.K. would likely have served that time by the time he was admitted to API.

The State filed an opposition to J.K.'s motion to dismiss, arguing that there was no injustice because delay was a normal part of the process. According to the prosecutor, "[i]t does not work an injustice to the defendant if the [statutory] procedure [of determining a defendant's competency to stand charges and restoring him to competency] is followed, regardless of the status of negotiations or the length of time [J.K.] may face if convicted of this crime."

The next status hearing was held on November 6. At that hearing, the defense attorney inquired when the trial court would rule on the pending motion to dismiss and noted that J.K. had been in custody for 233 days — "nine days away from

---

[14] The exercise of a trial court's discretion under Alaska Criminal Rule 43(c) can be with or without prejudice depending on the circumstances. *Cf.* AS 12.47.110(b) (ordering dismissal of charges without prejudice at the end of specified commitment periods); *Jordan v. State*, 407 P.3d 499, 501 (Alaska App. 2017) (explaining that Criminal Rule 43(a)(1), authorizing dismissal of charges by the prosecuting attorney, was "addressed to dismissals without prejudice" (emphasis removed)).

a year with good time."[15] The trial court explained that it still needed more information, and it again called API for an update regarding J.K.'s status on the waitlist. A representative from API stated that J.K. was now number eight on the waitlist, but the representative still could not say when J.K. would actually be admitted for competency restoration treatment.

The trial court expressed its discomfort with "keeping [J.K.] in limbo forever," but did not rule on the pending motion to dismiss at that time. Instead, the court scheduled another status hearing the following week for the parties to make oral arguments.

At that hearing, held November 14, the defense attorney asked the court to rule on the pending motion to dismiss, pointing out that J.K. had already spent 241 days incarcerated, and that API still could not guarantee his admission within any specific time period.

The prosecutor argued (erroneously) that the court had no authority to dismiss the case. The prosecutor acknowledged that "the status quo right now is certainly not the best of all worlds," but she asserted that continued detention in jail is "a better option in terms of safety to [J.K.], safety to the community, than the alternative which is to release him with absolutely no plan and no safeguards in place to protect him and the community." The trial court again expressed frustration that J.K. was sitting in jail and likely "getting worse," but questioned whether "cutting him loose does a lot of good." The option of seeking civil commitment under Title 47 was again not mentioned or discussed.

---

[15] *See* AS 33.20.010(a) (explaining the good time calculation, where a defendant "sentenced to a term of imprisonment that exceeds three days is entitled to a deduction of one-third of the term of imprisonment rounded off to the nearest day if the prisoner follows the rules of the correctional facility in which the prisoner is confined").

Two days later, on November 16, the trial court summarily denied J.K.'s motion to dismiss in a written order. The trial court later explained that it had denied the motion "in part because we didn't really have a place for [J.K.] to go."

Ten days later, on November 26, J.K.'s defense attorney filed a second motion to dismiss. The motion cited to *Jackson v. Indiana*, and asserted that J.K.'s continued detention due to the limited capacity at API violated his right to substantive due process under the state and federal constitutions.[16] The motion also cited to multiple cases from other jurisdictions in which courts had held that similar lengthy delays violate substantive due process.[17] The motion contended that the remedy for the constitutional violation was dismissal of the case without prejudice.

The prosecutor filed an opposition to the second motion to dismiss, reiterating her argument that the process of determining J.K.'s competency to stand trial and restoring him to competency "contemplates a delay." The prosecutor did not respond to the constitutional arguments made in the second motion to dismiss; nor did she address the out-of-state authority cited in the motion.

---

[16]   *See Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("At the least, due process requires that the *nature* and *duration* of commitment bear some reasonable relation to the purpose for which the individual is committed." (emphasis added)); *see also Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1122 (9th Cir. 2003) (applying *Jackson* to restorative competency services to hold that substantive due process prohibits the state from detaining "incapacitated criminal defendants in jail for weeks or months . . . because the nature and duration of their incarceration bear no reasonable relation to the evaluative and restorative purposes for which courts commit those individuals").

[17]   *See, e.g.*, *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, 822 F.3d 1037 (9th Cir. 2016); *Mink*, 322 F.3d 1101; *Disability Law Ctr. v. Utah*, 180 F. Supp. 3d 998 (D. Utah 2016); *Terry ex rel. Terry v. Hill*, 232 F. Supp. 2d 934 (E.D. Ark. 2002); *Powell v. Maryland Dep't of Health*, 168 A.3d 857 (Md. 2017); *Lakey v. Taylor*, 435 S.W.3d 309 (Tex. App. 2014); *State v. Hand*, 401 P.3d 367 (Wash. App. 2017).

On December 17, the same day that J.K.'s attorney filed his reply to the State's opposition, the trial court issued an order extending J.K.'s commitment for competency restoration treatment for another 90 days.[18] The order also directed that a status hearing be calendared for January 3, 2019. When that status hearing was not calendared, J.K.'s attorney filed another request seeking a ruling on the second motion to dismiss.

But the court did not issue a ruling on the second motion to dismiss. Instead, the court held another status hearing on January 23. At this point, J.K. had been in custody without access to competency restoration treatment for 311 days.

At the January 23 hearing, the court indicated that it intended to deny the second motion to dismiss, but that it also intended to make sure that J.K. was not held for longer than 365 days — the maximum sentence for a class A misdemeanor.

On January 29, 2019, the trial court entered two orders. The first order reiterated the December 17 order committing J.K. "for another 90 days for a competency restoration program." But the order also made clear that the commitment would end on March 18, 2019, the date by which J.K. would have been in custody for 365 days. The second order denied J.K.'s second motion to dismiss, noting that J.K. was now number two on the waitlist. The order also directed J.K. to be released from custody if he was not restored to competency by March 18, 2019.

On February 1, 2019, J.K.'s defense attorney filed an expedited petition for review with this Court. This Court granted expedited consideration of the petition and ordered the State to respond on an expedited basis. In response, the State initiated civil commitment proceedings against J.K. under Title 47 and dismissed J.K.'s criminal case without prejudice, thereby rendering this case moot.

---

[18] *See* AS 12.47.110(b).

This Court granted J.K.'s petition for review under the public interest exception to the mootness doctrine. This decision now follows.

*Substantive due process and the rights of criminal defendants who have been found incompetent to stand trial*

Under AS 12.47.110(a), a trial court has the authority to commit an incompetent defendant "to the custody of the commissioner of health and social services" for up to 90 days in an effort to restore the defendant to competency. As previously mentioned, this initial commitment period is mandatory in all felony cases but discretionary in misdemeanor cases.[19]

This initial 90-day commitment may be extended, at the trial court's discretion, for another 90 days, provided that the defendant is improving and there is good reason to believe that the defendant will probably soon be able to stand trial.[20] If the defendant has not regained competency at the expiration of the second 90-day commitment order, the trial court is required to dismiss the case without prejudice — except in cases where the defendant is charged with a crime involving force against a person.[21] If the defendant is charged with a crime involving force against a person, the trial court retains the discretion to extend the commitment for an additional six months, provided the court finds that: (1) "the defendant presents a substantial danger of physical

---

[19] AS 12.47.110(a).

[20] *See* AS 12.47.110(b); *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) (explaining that, when a criminal defendant is committed on the basis of incompetency to stand trial, it must be "determined that the defendant probably soon will be able to stand trial").

[21] AS 12.47.110(b).

injury to other persons"; and (2) "there is a substantial probability that the defendant will regain competency within a reasonable period of time."[22]

As a matter of substantive due process, an incompetent defendant may not be held "more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future."[23] In other words, due process requires that a defendant be committed for competency restoration treatment only when there is good reason to believe that the treatment is likely to restore the defendant to competency in the near future.[24] "If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit . . . any other citizen, or release the defendant."[25]

Due process also requires that "the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."[26] Thus,

---

[22] *Id.*

[23] *Jackson*, 406 U.S. at 738.

[24] *See Powell v. Maryland Dep't of Health*, 168 A.3d 857, 874 (Md. 2017) ("If the defendant is not restorable — *i.e.*, not likely to become competent within the foreseeable future — the government must either release the defendant or institute civil commitment proceedings.").

[25] *Jackson*, 406 U.S. at 738.

[26] *Id.* Due process governs other aspects of an incompetent defendant's treatment as well. For instance, if the competency restoration treatment includes forced medication, the defendant is entitled to a hearing under *Sell v. United States*, 539 U.S. 166 (2003). An incompetent defendant may not be forcibly medicated unless the court specifically finds that (1) important governmental interests are at stake; (2) involuntary medication will significantly further those important governmental interests; (3) involuntary medication is necessary to further those interests; and (4) administration of the drugs is medically

(continued...)

"even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal."[27] In other words, a defendant who has been found incompetent and committed to competency restoration treatment cannot languish in jail without access to the treatment.[28] Instead, defendants are entitled to a "reasonably timely" transfer to the facility that provides competency restoration treatment.[29]

---

[26] (...continued)
appropriate, *i.e.*, in the patient's best medical interest in light of his or her mental condition. *Sell*, 539 U.S. at 180-82.

[27] *Jackson*, 406 U.S. at 738; *see Carr v. State*, 815 S.E.2d 903, 912 (Ga. 2018) ("No matter how short the duration of the detention, if the *nature* of the confinement is not reasonably related to the government's purpose of accurately evaluating the individual defendant's potential to attain competency, the detention is unconstitutional.").

[28] *See Lakey v. Taylor*, 435 S.W.3d 309, 320 (Tex. App. 2014) ("An incompetent defendant's prolonged detention cannot be 'justified by progress toward [the goal of restoring competency]' if he is not receiving any competency-restoration treatment." (alteration in original) (citation omitted)). We note that some jurisdictions have concluded that speedy trial rights are also implicated by delays in obtaining competency restoration. *See, e.g.*, *Craft v. Superior Court*, 140 Cal.App.4th 1533, 1545, 44 Cal.Rptr.3d 912, 920 (Cal. App. 2006) ("Because commitment and treatment are the intertwined rationales for suspending criminal proceedings against a mentally incompetent defendant, it follows that where there is no commitment and no treatment, the time an incompetent defendant spends in jail is unnecessary and implicates not only due process, but also counts towards a finding of prolonged incarceration under the state constitutional speedy trial guarantee." (citation omitted)). We do not address this question here because it has not been raised.

[29] *Oregon Advocacy Ctr. v. Mink*, 2002 WL 35578910, at *7 (D. Or. May 10, 2002) (unpublished), *judgment entered*, 2002 WL 35578888 (D. Or. May 15, 2002) (unpublished), *aff'd*, 322 F.3d 1101 (9th Cir. 2003), *modified*, 2020 WL 2465331 (D. Or. May 13, 2020) (unpublished) [hereinafter *Mink District Order*]; *see also Powell*, 168 A.3d at 874 ("Any delay in transferring that defendant to a designated facility pursuant to a commitment order must be reasonable in relation to the purpose of treating the defendant while protecting both

(continued...)

The only facility that currently provides competency restoration treatment in Alaska is the Alaska Psychiatric Institute (API), an in-patient psychiatric facility with limited bed space. Unlike other states, Alaska does not have an out-of-custody competency restoration program.[30] Nor does it have adequate forensic beds to meet the demands of the criminal justice system.[31]

---

[29]  (...continued)
the defendant and the public.").

[30]  W. Neil Gowensmith et al., *Lookin' for Beds in All the Wrong Places: Outpatient Competency Restoration as a Promising Approach to Modern Challenges*, 22 Psychol., Pub. Pol'y & L. 293, 296 & tbl.1 (2016) (providing data from 2014, where 36 states explicitly allowed outpatient competency restoration while Alaska explicitly prohibited outpatient competency restoration); *see also Carr*, 815 S.E.2d at 916 ("To ensure that the nature of commitment to the department is appropriate for the particular defendant, the court should consider all relevant evidence and make a finding as to whether the evaluation required by [Georgia's competency statute] should be conducted on an inpatient or outpatient basis."); *id.* at 916-17 & n.17 (remanding and requiring the trial court in the first instance to exercise discretion "in deciding whether [the defendant] should be committed to the department's custody for evaluation or should be evaluated on an outpatient basis" and instructing the court to consider whether the defendant should have been returned to release on bond and whether the duration of his detention was unreasonable).

[31]  This systemic problem is the subject of a recent report to the Department of Health and Human Services. *See* Agnew:Beck Consulting Inc., et al, *Forensic Psychiatric Hospital Feasibility Study*, at 5-6 (Feb. 1, 2019) *available at* http://dhss.alaska.gov/API/Documents/ AdminChanges/ForensicPsychHospital_FeasibilityStudy_ExecutiveSummary_201907.pdf (last visited July 11, 2020) (stating that "Alaska's forensic system is overloaded" and that there is "a need to expand capacity for both competency evaluations and for providing treatment for competency restoration"). We note that this capacity problem was foreseen in 2008 when the legislature amended AS 12.47.110 to make restoration treatment for incompetent defendants charged with felonies mandatory. *See* Minutes of Senate Judiciary Comm., Senate Bill 234, testimony of Ron Adler, CEO/Director, API, 2:44:30-2:44:56 p.m. (Feb. 29, 2008) (explaining that the proposed provisions of SB 234 "could cause capacity issues in the future" and "could result in additional planning for changes in the facility or

(continued...)

In the current case, J.K. was charged with a misdemeanor, for which commitment under AS 12.47.110(a) is discretionary rather than mandatory. J.K. was committed under an initial 90-day order, but he was put on a waitlist and the 90-day commitment order expired before he was transferred to API for competency restoration treatment. J.K. asserts that the lengthy delay in obtaining competency restoration treatment violated his right to substantive due process under the state and federal constitutions.[32] The State now acknowledges that J.K.'s constitutional rights "may" have been violated.

Courts in other jurisdictions that have confronted similar delays have consistently found that such delays violate substantive due process.[33] Many of these

---

[31] (...continued)
additional facilities in the state" because "the forensic unit at API is typically full with a waiting list"); *see also* Fiscal Note 8 for SB 265, API, Behavioral Health, Dep't of Health & Soc. Servs. (Apr. 9, 2008) ("[I]f the current trend of increasing admissions to the Alaska Psychiatric Institute continues, it will cause capacity issues that may have to be addressed at a later date.").

[32] *See* U.S. Const. amend. XIV; Alaska Const. art. I, § 7.

[33] *See, e.g., Terry ex rel. Terry v. Hill*, 232 F. Supp. 2d 934, 944 (E.D. Ark. 2002) (holding that the average wait time of over six months for admission into the state hospital was "far beyond any constitutional boundary"); *Mink District Order*, 2002 WL 35578910, at *3-4, *6 (concluding that a 31.98-day average wait time for transport to the state hospital, with delays of up to 166 days, was a violation of due process); *State v. Hand*, 429 P.3d 502 (Wash. 2018) (holding that the state violated the defendant's substantive due process rights by detaining him for 76 days before providing competency restoration treatment); *In re Loveton*, 244 Cal.App.4th 1025, 1048, 198 Cal.Rptr.3d 514 (Cal. App. 2016) (holding that a trial court's 60-day transfer deadline for defendants incompetent to stand trial "realistically places an outside limit on what is statutorily and constitutionally permissible"); *State v. Kidder*, 389 P.3d 664 (Wash. App. 2016) (affirming the trial court's dismissal of criminal charge without prejudice on statutory and due process grounds when the defendant was not transported to the state hospital for restoration treatment until after the 90-day commitment

(continued...)

cases involve civil lawsuits brought by or on behalf of mentally incompetent defendants who were held in jail for lengthy periods of time awaiting their transfer to the state mental hospital for competency restoration treatment.[34]

In *Oregon Advocacy Center v. Mink*, for example, an advocacy center brought suit on behalf of mentally incompetent defendants whose transfers to the state mental hospital were averaging one month or more.[35] A federal district court in Oregon concluded that there was "no rationalization that passes constitutional muster for unreasonably detaining persons found unfit to proceed in county jails."[36] And the court

_____

[33] (...continued) order expired and when the defendant had been in confinement for 175 days by the time of the dismissal).

[34] *See, e.g.*, *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, 822 F.3d 1037 (9th Cir. 2016) (plaintiffs in a 42 U.S.C. § 1983 action were members of a class of pretrial detainees suspected of being mentally incompetent, next friends of such pretrial detainees, and disability rights organization); *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003) (plaintiffs included mentally incapacitated criminal defendant who was detained in a county jail while awaiting transfer to state hospital and two nonprofit organizations that represent such defendants); *Disability Law Ctr. v. Utah*, 180 F. Supp. 3d 998 (D. Utah 2016) (plaintiffs in putative class action under § 1983 were the Disability Law Center and pretrial detainees who had been declared incompetent to stand trial but had not been adjudicated guilty of a crime); *Advocacy Ctr. for Elderly & Disabled v. Louisiana Dep't of Health & Hosps.*, 731 F. Supp. 2d 603 (E.D. La. 2010) (plaintiffs were incompetent criminal defendants detained pretrial and disability advocacy organization); *Terry*, 232 F. Supp. 2d 934 (plaintiffs in § 1983 class action were pretrial detainees); *In re Loveton*, 244 Cal.App.4th 1025 (defendants were detainees who had been found mentally incompetent to stand trial and filed consolidated petitions for writ of habeas corpus); *Lakey v. Taylor*, 435 S.W.3d 309 (Tex. App. 2014) (plaintiffs were Disability Rights Texas and nine pretrial detainees who had been found incompetent to stand trial).

[35] *Mink*, 322 F.3d at 1106.

[36] *Mink District Order*, 2002 WL 35578910, at *6; *see also Lakey*, 435 S.W.3d at 320-21 (continued...)

further concluded that "[t]he lack of funds, staff or facilities cannot justify defendants' failure to provide persons found unfit with the treatment that is necessary to attempt restoration of competency."[37] The court ordered that incompetent defendants must be admitted to a treatment facility "in a reasonably timely manner" — which the court interpreted as no later than seven days after the issuance of an order finding a criminal defendant incompetent to stand trial and committing him to restoration treatment.[38]

The State of Oregon appealed this ruling to the Ninth Circuit, which affirmed the finding of a substantive due process violation and upheld the district court's injunction requiring admission within seven days.[39] Drawing support from *Jackson v. Indiana*, the Ninth Circuit explained that "[h]olding incapacitated criminal defendants in jail for weeks or months violates their due process rights because the nature and duration of their incarceration bear no reasonable relation to the evaluative and restorative purposes for which courts commit those individuals."[40]

---

[36] (...continued)
("The lengthy pretrial detention of an incompetent defendant, without any progress at all toward the stated goal of competency-restoration treatment, is not rationally related to any legitimate governmental interest.").

[37] *Mink District Order*, 2002 WL 35578910, at *6.

[38] *Id.* at *7.

[39] *Mink*, 322 F.3d at 1122-23.

[40] *Id.* at 1122; *see also Advocacy Ctr. for Elderly & Disabled v. Louisiana Dep't of Health & Hosps.*, 731 F. Supp. 2d 603, 621 (E.D. La. 2010) (relying on *Jackson* to hold that "the continued imprisonment of the Incompetent Detainees in parish jails . . . does not bear a reasonable relationship to either restoring the Detainees to competency or determining that they will never become competent"); *Lakey*, 435 S.W.3d at 321 ("Based on *Jackson*, we agree that an incompetent defendant's continued detention for competency restoration must be justified by progress toward that goal, such that his due-process rights are violated if he
(continued...)

A federal district court in Washington reached a similar conclusion in *Trueblood v. Washington State Dep't of Soc. & Health Servs.*[41] In *Trueblood*, the court found "seven days to be the maximum justifiable period of incarceration" allowed by the Fourteenth Amendment.[42] Following a bench trial, the court concluded that a "seven-day limit is required by the Constitution" because holding incompetent defendants in jail causes harm that directly conflicts with the goal of competency restoration:

> Each additional day of incarceration causes further deterioration of class members' mental health, increases the risks of suicide and of victimization by other inmates, and causes illness to become more habitual and harder to cure, resulting in longer restoration periods or in the inability to ever restore that person to competency.[43]

The State of Washington did not appeal this part of the court's order.[44]

---

[40] (...continued)
fails to receive any competency-restoration treatment within a reasonable amount of time following the court's entry of the order of commitment.").

[41] *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, 101 F. Supp. 3d 1010 (W.D. Wash. 2015).

[42] *Id.* at 1022.

[43] *Id.*; *see also Mink District Order*, 2002 WL 35578910, at *4 ("Persons who are found unfit to stand trial and remain in jail suffer constitutionally cognizable harm, and are entitled to prompt treatment in a rehabilitative facility. Even short periods of incarceration of these persons can cause cognizable harm.").

[44] The federal district court's permanent injunction required both initial competency evaluations and admission to competency restoration services to occur within seven days of a court order. Because the State of Washington only appealed the portion of the injunction related to the time limit for the initial competency evaluations, the Ninth Circuit only addressed whether due process compelled the State to perform these evaluations within seven days of a court order. The Ninth Circuit held that due process required the Department of
(continued...)

Although courts have been uniform in finding that lengthy delays in obtaining restoration treatment violate an incompetent defendant's substantive due process rights, courts have been varied in their determination of what constitutes a "reasonable" delay in transferring an incompetent defendant to a mental health facility. As already mentioned, federal district courts in Oregon and Washington have set the deadline at seven days. However, other courts have set deadlines of twenty-one days and thirty days.[45]

---

[44]  (...continued)
Social and Health Services to "conduct competency evaluations within a reasonable time following a court's order," but that the "district court's seven-day mandate . . . impose[d] a temporal obligation beyond what the Constitution requires." *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, 822 F.3d 1037, 1040 (9th Cir. 2016).

[45]  *See, e.g.*, *Advocacy Ctr. for Elderly & Disabled*, 731 F. Supp. 2d at 627 (issuing, after an evidentiary hearing, a preliminary injunction setting a 21-day transfer); *see also Cooper v. Kliebert*, 2016 WL 3892445 (M.D. La. July 18, 2016) (unpublished) (denying Louisiana Department of Health and Hospital's motion to dismiss plaintiffs' complaint arising out of similar litigation to *Advocacy Ctr. for Elderly & Disabled*, while noting that the prior litigation in *Advocacy Ctr.* had later resulted in a consent decree that set a 30-day deadline for admission to the state hospital).

Some courts have been reluctant to set precise deadlines.[46] In *Terry, by and through Terry v. Hill*, for example, a federal district court in Arkansas concluded that delays that averaged over six months for defendants awaiting treatment violated substantive due process.[47] The court had heard testimony that the state hospital was in "crisis" because the number of competency referrals had increased and the hospital's ability to admit patients had decreased due to limited funding, space, and staffing.[48] The court concluded that "[t]he lengthy and indefinite periods of incarceration, without any legal adjudication of the crime charged, caused by the lack of space at [the state hospital], is not related to any legitimate goal, is purposeless and cannot be constitutionally inflicted upon the members of the class."[49] The court deferred consideration of "what length of wait is constitutionally permissible," but it noted that "the length of wait experienced by inmates today is far beyond any constitutional boundary."[50]

---

[46] *See, e.g.*, *Powell v. Maryland Dep't of Health*, 168 A.3d 857, 876 (Md. 2017) ("While the due process clause sets some outside constraints, a one-size fits all approach is unlikely to be reasonable."); *see also State v. Hand*, 429 P.3d 502, 506-07 (Wash. 2018), *aff'g* 401 P.3d 367 (Wash. App. 2017) (holding that the state hospital's 61-day delay in admitting defendant for competency restoration treatment was unreasonable and violated substantive due process rights without commenting on general reasonableness standard); *In re Loveton*, 244 Cal.App.4th 1025, 1043-44, 1047 n.19, 198 Cal.Rptr.3d 514 (Cal. App. 2016) (affirming the trial court's 60-day deadline, which the court had found "constitutes a reasonable time to effectuate a transfer from the county jail to a state mental hospital for evaluation and treatment," but limiting the order to that particular case and noting the "piecemeal nature of countywide standing orders").

[47] *Terry ex rel. Terry v. Hill*, 232 F. Supp. 2d 934, 938, 943 (E.D. Ark. 2002).

[48] *Id.* at 937-38.

[49] *Id.* at 943-44.

[50] *Id.* at 944.

*Our resolution of this case*

In the current case, J.K. requests that we find that the more than 100-day delay that he experienced violated his right to substantive due process.[51] He also requests that we set a presumptive deadline of ten days for transferring incompetent defendants who have been committed for restoration treatment to API. J.K. argues that setting a presumptive deadline of ten days will ensure that most defendants are transferred on a timely basis but will provide for flexibility if unusual circumstances prevent a timely transfer in a particular case. The State opposes the setting of any presumptive deadline. It argues that further factual development regarding current changes to API's operations and its attempts to reduce its waitlist is needed before a presumptive deadline can be set.

We agree with the State that additional information is needed before a reasonable presumptive deadline can be set.[52] That said, we have no difficulty in finding that the delay that occurred in J.K.'s case is "far beyond any constitutional boundary."[53] Here, the defendant was charged with a misdemeanor, for which the initial commitment was discretionary, not mandatory. Moreover, it was apparent at arraignment that J.K. was suffering from a severe mental illness for which civil commitment would likely be appropriate. It was also apparent from the competency evaluation that J.K. had a low likelihood of regaining competency in the foreseeable future. And finally, it was

---

[51]   J.K. filed his second motion to dismiss on November 26, 2018, at which time he had been committed for restoration without treatment for 103 days. The court denied the motion on January 30, 2019, at which time he had been committed for restoration without treatment for 168 days. After this petition was filed, the State initiated civil commitment proceedings and dismissed J.K.'s criminal case without prejudice, at which time J.K. had been committed for restoration without treatment for 173 days.

[52]   *See Powell*, 168 A.3d at 876 (noting that courts that have set a deadline have "generally had the benefit of a detailed record after a trial or evidentiary hearing").

[53]   *See Terry*, 232 F. Supp. 2d at 944.

apparent within days of the issuance of the commitment order that J.K. was unlikely to be transferred to API within a reasonable time and that he was likely to languish in jail, further decompensating mentally, for most, if not all, of the 90-day commitment order.

Under these circumstances, it was incumbent upon the trial court to take action to remedy what was a clear violation of J.K.'s constitutional rights. The amount of time that this seriously mentally ill defendant remained in jail awaiting competency restoration treatment is unacceptable.

In the briefing before this Court, the parties suggest that a special master be appointed to hear evidence and make factual findings on the many issues relating to the delays in admission for restoration treatment so that a presumptive time limit can be set for these types of cases. We conclude that a special master appointment is not currently needed because there is already ongoing litigation in the trial courts that appears to be directed at solving this problem.[54]

In the interim, we urge trial courts to be vigilant in ensuring that defendants who have been found to be incompetent are not left languishing in jail and that the nature and duration of their commitment bear a reasonable relationship to the purpose for which the defendant is committed.[55]

---

[54] *See Neakok v. State*, Trial Court No. 3AN-18-10547 CI.

[55] *See Jackson v. Indiana*, 406 U.S. 715, 738 (1972).